UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 22-1315-GW-MAAx | Date | June 3, 2022 |
|---|---|---|---|
| Title | *The Santa Barbara Apartment Association, Inc. v. City of Santa Barbara, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:** IN CHAMBERS - TENTATIVE RULING ON DEFENDANTS' MOTION TO DISMISS [22]

Attached hereto is the Court's Tentative Ruling on Defendants' Motion to Dismiss [22], set for hearing on June 6, 2022 at 2:30 p.m.

Initials of Preparer   JG

***The Santa Barbara Apartment Ass'n, Inc., et al. v. City of Santa Barbara***, Case No. CV 22-cv-01315 GW (MAAx);  Tentative Ruling on Motion to Dismiss

**I. Background**

The Santa Barbara Apartment Association, Inc. dba Santa Barbara Rental Property Association ("SBAA"), and Nogora, LLC ("Nogora" and, together with SBAA, "Plaintiffs") sue the City of Santa Barbara ("the City"), the City Council of the City of Santa Barbara ("the City Council"), and Ariel Calonne, in his official capacity as City Attorney for the City of Santa Barbara (collectively, "Defendants"), asserting five claims for relief:  1) facial and as-applied violation of the Contracts Clause (U.S. Const. art. I, § 10, cl. 1; 42 U.S.C. § 1983); 2) facial and as-applied violation of the Takings Clause of the United States Constitution (U.S. Const. amends. V, XIV; 42 U.S.C. § 1983; 3) facial and as-applied violation of the Unconstitutional Conditions Doctrine (U.S. Const. amends. V, XIV; 42 U.S.C. § 1983); 4) facial and as-applied violation of the Fourth Amendment (Unlawful Seizure) (U.S. Const. amends. IV, XIV; 42 U.S.C. § 1983); and 5) unlawful relocation payment amount (Cal. Code of Civ. Proc. § 1085).  Nogora alone asserts the second claim for relief; otherwise, all claims are pled by Plaintiffs against Defendants.  Defendants now move to dismiss the Complaint in its entirety.[1]

This case, as Plaintiffs have summarized it, concerns an ordinance (Ordinance No. 5979) and resolution (Resolution No. 20-084) that the City enacted and that "together compel rental housing owners to pay off tenants, whether wealthy or in need, an extraordinary three times the monthly rent just for the right to repossess their properties."  Complaint, Docket No. 1, ¶ 1 (emphasis omitted).  The SBAA is an association whose members are individual rental housing owners.  *See id.* ¶¶ 3, 8.  Nogora, owned by a "small mom-and-pop landlord," was "forced to pay three times the monthly rent to tenants who simply moved from one unit in a duplex to the other, just so the landlord could perform necessary sewer and plumbing work."  *Id.* ¶ 3; *see also id.* ¶¶ 9, 25.

---

[1] Plaintiffs concede that their fourth claim for relief is not viable in light of the Ninth Circuit's decision in *Ballinger v. City of Oakland*, 24 F.4th 1287 (9th Cir. 2022) ("*Ballinger II*"), *petition for cert. filed*, _ U.S.L.W. _ (U.S. Feb. 28, 2022) (No. 21-1181).  *See* Docket No. 25, at 8:6-7, 23:13-18; *see also Ballinger I*, 24 F.4th at 1300 (concluding seizure claim fatally-flawed because of lack of state action because, for example, city "did not participate in the monetary exchange between the Ballingers and their tenants").  They address it here only to preserve the claim and their arguments relating thereto.  *See* Docket No. 25, at 23:13-18.  As a result, the Court will not discuss that claim further herein, but will instead summarily dismiss it with prejudice.

Ordinance No. 5979 amended the Santa Barbara Municipal Code "by adding Chapter 26.50 pertaining to 'just cause' for residential evictions." *See id.* ¶ 15. It mandates, in relevant part, that "[t]he owner of a rental unit who issues a termination notice based upon no-fault just cause shall make a relocation assistance payment to each qualified tenant in an amount established by resolution of the City Council, or one month's rent plus one dollar, whichever is greater." *Id.* ¶ 16. "No fault just cause" means the following circumstances:

> a. Intent to occupy the rental unit by the owner or their spouse, domestic partner, children, grandchildren, parents, or grandparents if a provision of the lease allows the owner to terminate the lease when the owner, or their spouse, domestic partners, children, grandchildren, parents, or grandparents, unilaterally decides to occupy the rental unit.
> b. Withdrawal of the rental unit from the rental market.
> c. The owner complying with any of the following:
>> i. An order issued by a governmental agency or court relating to habitability that necessitates vacating the rental unit.
>> ii. An order issued by a government agency or court to vacate the rental unit.
>> iii. A local ordinance that necessitates vacating the rental unit.
> d. Intent to totally demolish or to substantially remodel the rental unit.

*Id.* ¶ 18. Resolution No. 20-084 then set the relocation payment amount equal to "3.0 months of the rent that was in effect when the owner issued the notice to terminate the tenancy." *Id.* ¶ 19.

Plaintiffs assert that the amount of the relocation payment was arbitrarily-selected despite the City Council's real estate advisory firm's recommendation of a different amount that the City Council rejected because it was not high enough. *See id.* ¶¶ 20, 65. Furthermore, there is no "means testing" to ensure that only tenants in actual need of assistance with relocation are entitled to the relocation payment, *see id.* ¶ 21, and the payment ultimately can be used for any private purpose that the tenant desires, *see id.* ¶ 22.

If these provisions are violated, that violation may be raised as a defense to an unlawful detainer action; it entitles the aggrieved tenant to actual damages, as well as attorneys' fees and costs; the City Attorney is authorized to enforce the Chapter through administrative, civil, and criminal action; and the City Attorney is authorized to bring actions for injunctive relief, as well as for the City's costs, expenses, and attorneys' fees. *See id.* ¶ 23.

## II. Analysis

Under Rule 12(b)(6), concerning whether a complaint has properly stated a claim, a court is to: (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-

pleaded factual allegations as true, as well as all reasonable inferences to be drawn from them. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998); *see also Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). The court need not accept as true "legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *see also Twombly*, 550 U.S. at 562-63 (dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief). However, a plaintiff must also "plead 'enough facts to state a claim to relief that is plausible on its face.'" *Johnson*, 534 F.3d at 1122 (quoting *Twombly*, 550 U.S. at 570).[2] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

---

[2] In their Opposition brief, Plaintiffs cite the Ninth Circuit's 2022 decision in *Ernst & Haas Management Company v. Hiscox, Inc.*, 23 F.4th 1195, 1199 (9th Cir. 2022) for the propositions that motions to dismiss are "viewed with disfavor and . . . rarely granted" and that dismissal is appropriate "only if it appears beyond doubt that [the] plaintiff can prove no set of facts in support of its claims which would entitle it to relief." Docket No. 25, at 10:18-22. Regrettably, these are accurate quotations from that decision, so Plaintiffs cannot be criticized for referring to them. Alarmingly, however, they are quotations that seek to revive standards pre-dating the pre-*Twombly*/*Iqbal* revolution in pleading standards, harkening back to *Conley v. Gibson*, 355 U.S. 41 (1957) – *i.e.*, the case *Twombly* explicitly-overruled/abandoned in this regard, *see* 550 U.S. 544, 562-63 (2007). It would be one thing if *Ernst & Haas* were an outlier in this regard, but that decision cites *City of Almaty v. Khrapunov*, 956 F.3d 1129, 1131 (9th Cir. 2020) as support in this regard, a case which in turn cites *Painters & Allied Trades District Council 82 Health Care Fund v. Takeda Pharmaceuticals Company Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019), a case which in turn *cites Bain v. California Teachers Association*, 891 F.3d 1206, 1211 (9th Cir. 2018). Each of those earlier decisions similarly – at least with respect to the "no set of facts" point; *Ernst & Haas* by itself attempts to revive the "viewed with disfavor" standard by citing a 1991 Ninth Circuit decision, *see Ernst & Haas*, 23 F.4th at 1199 (quoting *McDougal v. Cty. of Imperial*, 942 F.2d 668, 676 n.7 (9th Cir. 1991)) – take the reader down a pleading path that one would have thought any first year civil procedure student would have recognized as overgrown with analytical weeds stemming from lack of use over the course of the last 15 years or so. The earliest of these four decisions, *Bain*, is where the Ninth Circuit first appears to have stepped off into the procedural jungle from the clearly-lit course paved with the thousands of pages from 15 years of jurisprudence based upon *Twombly* and *Iqbal*. *See Bain*, 891 F.3d at 1211 (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1061 (9th Cir. 2004), which in turn quoted *Conley*, 355 U.S. at 45-46). It would do the Ninth Circuit some good for it to get everyone – perhaps most-importantly, itself – back on the correct path as quickly as possible.

In its consideration of the motion, the court is limited to the allegations on the face of the complaint (including documents attached thereto, such as – for example – the relevant resolution and ordinance here), matters which are properly judicially noticeable and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir.), *cert. denied*, 512 U.S. 1219 (1994), *overruled on other grounds in Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *see also Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (indicating that a court may consider a document "on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion").

In assessing the four claims in this case that Plaintiffs have not conceded, the Court begins its discussion with the most-straightforward of those claims.

### A. Code of Civil Procedure § 1085

Plaintiffs' fifth claim for relief is titled "unlawful relocation payment amount" and asks the Court to make use of a "writ of ordinary mandamus" to "strike down" apparently just the "relocation payment amount" enacted by way of the ordinance and resolution in question here. *See* Complaint ¶¶ 63-64; *see also id.*, Prayer ¶ 5 (requesting, as to the fifth claim, "[a] writ of mandamus ordering the City to rescind its resolution setting the relocation payment amount of three times the monthly rent"). The Complaint specifically-references California Code of Civil Procedure § 1085. Section 1085 provides, in part, that "[a] writ of mandate may be issued by *any court* to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . ." Cal. Code Civ. Proc. § 1085(a) (emphasis added).

At least as of the Opposition and Reply briefs, the parties have argued this motion, with respect to this claim, as if it simply presented an issue of whether the Court has, but should (or should not) decline in its discretion, supplemental jurisdiction over this claim.[3] *See* Docket No. 25, at 23:19-25:8; Docket No. 26, at 16:7-17:20. Federal district courts have largely-declined to exercise supplemental jurisdiction over requests for federal courts to issue writs of mandate

---

[3] Defendants' opening brief simply asserted that "Section 1085 does not apply to federal courts" with a string-citation to cases reaching that conclusion on a variety of grounds. *See* Docket No. 22-1, at 21:5-21.

pursuant to Section 1085. *See, e.g.*, *Carne v. Stanislaus Cty. Animal Servs. Agency*, 445 F.Supp.3d 772, 776-78 (E.D. Cal. 2020) (exercising discretion, pursuant to 28 U.S.C. § 1367(c)(1), to decline supplemental jurisdiction because of "legal complexities and the awkward interface between state and federal judicial systems in this case"); *Fresno Unified Sch. Dist. v. K.U. ex rel. A.D.U.*, 980 F.Supp.2d 1160, 1184-85 (E.D. Cal. 2013); *see also* 28 U.S.C. § 1367(c). For their part, Plaintiffs have managed to locate what the Court views as an outlier in this respect, *Twin Sisters Gun Club v. Emlen*, No. 2:17-cv-01526-MCE-GGH, 2018 WL 1335394, *5-7 (E.D. Cal. Mar. 15, 2018).

The Court is actually more-persuaded by the scattershot approach Defendants took in their original brief. *See* Footnote 3, *supra*. Although there are certain federal court decisions apparently finding no problem with considering "claims" brought pursuant to Section 1085 (though doing so without actually considering the question of propriety), *see, e.g.*, *Independent Living Center of Southern California, Inc. v. Kent*, 909 F.3d 272, 278 (9th Cir. 2018), the Court is unaware of a theory (outside of perhaps anti-SLAPP motions in the *Erie* context) where a state legislature is permitted to define the scope of a federal court's permissible procedural mechanisms/power. Federal courts take their procedural direction from the United States Code, including the Federal Rules of Civil Procedure. Indeed, at least one court has declined to consider a party's attempt to pursue a writ of mandate under Section 1085 (or has construed it simply as a cause of action under 42 U.S.C. § 1983) because that provision is simply a procedural mechanism, not a substantive claim, while concluding that "it does not apply in federal court." *See S.F. Apartment Ass'n v. City & Cty. of S.F.*, 142 F.Supp.3d 910, 917 n.2 (N.D. Cal. 2015). *But see, e.g., Indep. Living*, 909 F.3d at 280 n.1.

Whether because it is or may be an *Erie* question, is or may be a question of the supremacy clause, is or may be a question of Section 1085 providing only for a procedure but not a cause of action, or whether the Court can – and will – only decline to exercise supplemental jurisdiction over it because it presents an "exceptional circumstance" and/or "compelling reason" pursuant to 28 U.S.C. § 1367(c)(4), Plaintiffs may not proceed in this Court with their writ of mandate claim in its present form. That claim is dismissed without prejudice, allowing Plaintiffs – if they can – to either re-frame the claim in this venue/action within any applicable provision of the United States Code or Federal Rules of Civil Procedure or, failing that, to attempt to present the claim before the courts of the State of California.

B. <u>Takings</u>

5

The Fifth Amendment to the United States Constitution – which applies to the states by way of the Fourteenth Amendment, *see Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 1002 n.16 (9th Cir. 2007), *aff'd*, 553 U.S. 591 (2008) – states that "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. "In order to state a claim under [this] Takings Clause, a plaintiff must first establish that he possesses a constitutionally protected property interest." *San Diego Police Officers' Ass'n v. San Diego City Employees' Retirement Sys.*, 568 F.3d 725, 740 (9th Cir. 2009) (quoting *McIntyre v. Bayer*, 339 F.3d 1097, 1099 (9th Cir. 2003)); *see also Schneider v. Cal. Dep't of Corrections*, 345 F.3d 716, 720 (9th Cir. 2003). If Plaintiffs have done so – there is no dispute on this point here – the question then becomes whether there has been a taking of that property, for which compensation is due. *See Enquist v. Or. Dep't of Agric.*, 478 F.3d 985, 1002 (9th Cir. 2007). There are "multiple approaches" to that second step. Id. at 1002 n.17. Defendants observe here that Plaintiffs advance both a "per se" taking theory and a "regulatory taking" theory.

Here, the parties pay considerable attention to the Ninth Circuit's recent decision in *Ballinger v. City of Oakland*, 24 F.4th 1287 (9th Cir. 2022) ("*Ballinger II*"), *petition for cert. filed*, _ U.S.L.W. _ (U.S. Feb. 28, 2022) (No. 21-1181).[4] At this point in time, it is worth considering that case in some detail. In *Ballinger II*, the Ninth Circuit determined that the City of Oakland requiring landlords to pay their tenants $6,000 before the landlords could move back into their own home was "more properly classified as a wealth-transfer provision but not an unconstitutional taking." *Id.* at 1290-91. Consequently, it affirmed the district court's dismissal of the landlords' physical takings claim (and other claims). *See id.* at 1291.

In contrast to the three-months-rent provision at issue here, Oakland landlords re-taking occupancy of their homes were required to pay tenants "a relocation payment based on rental size, average moving costs, the duration of the tenants' occupancy, and whether the tenants earn a low income, are elderly or disabled, or have minor children." *Id.* After first observing that "money can be the subject of a physical, also called a per se, taking," the Ninth Circuit concluded that "the relocation fee required by the Ordinance was a regulation of the landlord-tenant relationship, not

---

[4] As an aside, the author of *Ballinger II* also sat on the *Ernst & Haas* panel, and *Ballinger II* was issued *five days* after publication of *Ernst & Haas*. Yet *Ballinger II* appropriately recognized that – post-*Twombly* – "'[d]ismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'" 24 F.4th at 1292 (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1100 n.1, 1102 (9th Cir. 2008)). *See* Footnote 2, *supra*.

6

an unconstitutional taking of a specific and identifiable property interest." *Id.* at 1292; *see also id.* at 1294 ("[M]oney may still be subject to a per se taking if it is a specific, identifiable pool of money.").

Canvassing the history of Supreme Court rulings on states' powers to regulate housing conditions and landlord-tenant relationships, *Ballinger II* explained why "legislative enactments 'regulating the economic relations of landlord and tenants are not *per se* takings.'" *Id.* at 1293 (quoting *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987)); *see also id.* at 1294. The Ninth Circuit then observed that "the Ordinance imposes a transaction cost to terminate a lease agreement," and saw "little difference between lawful regulations, like rent control, and the Ordinance's regulation of the landlord-tenant relationship here." *Id.* at 1293. It therefore concluded that "the relocation fee is not an unconstitutional physical taking – it 'merely regulate[s] [the Ballingers'] *use* of their land by regulating the relationship between landlord and tenant.'" *Id.* (quoting *Yee v. City of Escondido*, 503 U.S. 519, 528 (1992)).

The Ninth Circuit then again acknowledged that "in certain circumstances not argued here, money can be the subject of a taking," but that in the case before it "the City's ordinance imposes a general obligation to pay money and does not identify any specific fund of money; therefore, it does not effectuate an unconstitutional physical taking." *Id.* at 1295. It specifically rejected the landlords' reliance on *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013), as an attempt to explain why the relocation fee amounted to an unconstitutional taking. *See Ballinger II*, 24 F.4th at 1296-97. Although the Ninth Circuit could not "deny that the relocation fee here is linked to real property," this was "no more so than property and estate taxes." *Id.* at 1297. The Ninth Circuit explained that, in *Koontz*, "[r]ather than a mere obligation to pay in relation to the use of one's property, the government . . . demanded and specifically identified that it wanted Koontz's payment of money in exchange for granting a benefit to either Koontz's parcel of land or another identified parcel of land," meaning that it "amounted to a taking of an interest in the real property itself." *Id.* In contrast, "the relocation fee required by the Ordinance is a monetary obligation triggered by a property owner's actions with respect to the use of their property, not a burden on the property owner's interest in the property." *Id.* The court closed by observing that "[u]nlike the cases that have found a taking of funds a violation of the Takings Clause, this Ordinance neither identifies the Ballingers' $6,582.40 as a parcel of money it intends to take, nor seeks to seize any escrow accounts or funds that meet certain criteria." *Id.*

7

With respect to their *per se* takings theory, Plaintiffs attempt to avoid *Ballinger II* by pointing to differences between Oakland's ordinance and the City's here. Specifically, they correctly note that Oakland's payment amount "is not based on the value of the affected tenant's leasehold estate; rather, it is based on factors that include 'rental size, average moving costs, and the duration of tenant's occupancy.'" Docket No. 25, at 18:8-10 (quoting *Ballinger II*, 24 F.4th at 1290). They then conclude that "[i]n light of this, the Ninth Circuit concluded the ordinance was more like a 'regulation of the landlord-tenant relationship, not an unconstitutional taking of a specific and identifiable property interest.'" *Id.* at 18:10-12 (quoting *Ballinger II*, 24 F.4th at 1292). In contrast, Plaintiffs point out that the City's regime here provides for payment of three months' rent, which they believe "clearly 'commands the relinquishment of funds linked to a specific, identifiable property interest.'" *Id.* at 18:13-19.

Plaintiffs' mixing-and-matching of various discussions at different points in the Ninth Circuit's *Ballinger II* decision is not a fair representation of that ruling. The way in which Oakland came up with the amount owed was not germane to the Ninth Circuit's decision. Instead, in contrast to the situation involved in *Koontz*, the Ninth Circuit concluded that Oakland's ordinance imposed "a general obligation to pay money and does not identify any specific fund of money." *Ballinger II*, 24 F.4th at 1295. Like the situation in *Ballinger II*, the payment in question here is linked to real property "no more so than property and estate taxes." *Id.* at 1297. While Plaintiffs' attempt to avoid *Ballinger II* may be creative, it is not based on a fair reading of that decision.

In short, *Ballinger II* forecloses Plaintiffs' attempt to demonstrate a *per se* taking. *Ballinger II*, however, specifically did *not* examine a regulatory takings argument. *See Ballinger II*, 24 F.4th at 1292 n.2. It is to that theory that this analysis now turns.

As to Plaintiffs' regulatory taking theory, Defendants' acknowledge that the "*Penn Central* factors" are front-and-center. In *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978), the Supreme Court identified "several factors that have particular significance" in engaging in the "essentially ad hoc, factual inquiries" that are frequently used to determine whether there has been an unconstitutional "taking" of an established property right. *Id.* at 123-24. Amongst those factors are "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Id.* at 124; *see also Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 625 (9th Cir. 2020), *cert. denied*, 141 S.Ct. 731 (2021). The Supreme Court also identified "the

8

character of the governmental action," *i.e.* whether it can be "characterized as a physical invasion by government" or instead "some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124; *Bridge Aina Le'a*, 950 F.3d at 625. "The first and second *Penn Central* factors are the primary factors." *Bridge Aina Le'a*, 950 F.3d at 630.

Defendants assert that "[t]he Supreme Court and the Ninth Circuit have consistently held that rent control provisions and other restrictions on landlord-tenant relationships are not regulatory takings," citing *Colony Cove Properties, LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018), *MHC Financing Limited Partnership v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013), *Yee*, 503 U.S. 519, *Pennell v. City of San Jose*, 485 U.S. 1 (1988), and *Block v. Hirsh*, 256 U.S. 135 (1921). However, it would be difficult for the Court to conclude, at this procedural stage, that those cases conclusively resolve the issue of a regulatory takings theory here. *See also Moore v. City of Costa Mesa*, 886 F.2d 260, 262 (9th Cir. 1989) ("Motions to dismiss for failure to state a claim must be viewed with particular skepticism in cases involving claims of inverse condemnation."). The appellate proceedings in *Colony Cove* and *MHC Financing* did not follow pleadings-stage determinations . *See Colony Cove*, 888 F.3d at 449 (appeal following jury verdict and denial of motion for judgment as matter of law); *MHC Fin.*, 714 F.3d at 1124 (appeal following trial). While *Pennell* did involve a review following a pleadings-stage determination, *see* 485 U.S. at 4, the Supreme Court determined – without citing *Penn Central* once in the majority opinion – that it was "premature to consider appellants' claim under the Takings Clause," *id.* at 15. *See also id.* at 10-11. As for *Yee* (which involved review of California Court of Appeal decisions, not a Ninth Circuit decision), the Supreme Court concluded that the regulatory taking issue was not properly before it. *See* 503 U.S. at 537-38. The procedural setting of the *Block* decision is unclear, but at a minimum it may be observed that the decision preceded *Penn Central* by decades.

Beyond citation to those cases, Defendants argue that Plaintiffs' Complaint offers only conclusory allegations as to the *Penn Central* factors. First, they assert that the Complaint lacks sufficient facts demonstrating a significant impact upon Plaintiffs' personal finances or their rental-housing business, and that simply alleging that one landlord had to make a payment is not enough. Second, they note that the landlord-tenant relationship is a highly-regulated area, with similar laws and regulations imposing financial burdens on property owners. As to interference with investment-backed expectations, Defendants again argue that Plaintiffs have offered only

conclusory allegations while at the same time "disregarding their choice to conduct business in a highly regulated area." Docket No. 22-1, at 17:12-13. Finally, they argue that Plaintiffs have not alleged any deprivation of economic use of the property, nor decreased market value.

Plaintiffs, of course, disagree. They believe that they have pled that the City's ordinance:

> requires an owner to permanently part with three months' rent, which she must convey to the tenant. No owner could reasonably have expected to have to convey such a property interest, either in law or in any existing lease, and the character of the mandate is such that it is entirely one-sided, benefitting one class of individuals (tenants) at the total expense of another class (owners). There is no reciprocity of advantage, but only a transfer of property from one group to another.

Docket No. 25, at 19:5-11. For purposes of a pleadings-based challenge, the Court agrees with Plaintiffs.

The Complaint certainly contains factual allegations supporting these assertions, and the Court disagrees with Defendants that those allegations are improperly conclusory, at least with respect to Nogora. *See* Complaint ¶¶ 3, 9, 16, 19, 22, 24-26. In addition, while the Court would agree with Defendants that the landlord-tenant relationship is heavily-regulated, there is nothing before the Court that would suggest landlords should have expected the nature – or at least certainly the extent – of the ordinance's transfer of funds from landlord to tenant.[5] Finally, both parties have intriguing points of view with respect to the "character of the governmental action" *Penn Central* factor (again, with the Ninth Circuit having advised that the other two Penn Central factors are the "primary" factors, *see Bridge Aina Le'a*, 950 F.3d at 630), but the Court does not believe a wholesale adoption of one of those views or the other at the pleading stage is appropriate – Defendants' view certainly does not preclude Plaintiffs from being able to state a claim.[6]

Defendants may prevail under *Penn Central* at a later stage of this litigation. But, for purposes of the pleadings, Plaintiffs have sufficiently-alleged a regulatory takings claim. Consequently, the Court will deny Defendants' motion to dismiss insofar as Plaintiffs' second cause of action is concerned.

C. Unconstitutional Conditions

---

[5] Defendants direct the Court to AB 1482, now codified at California Civil Code § 1946.2. However, as Defendants themselves admit, that legislation only became operative on January 1, 2020. *See* Docket No. 26, at 7:11-14. Thus, if Plaintiffs had notice that such provisions might be in the offing, that advance notice was limited.

[6] The *Horne* litigation that is the subject of the parties' debate on this point resulted from administrative proceedings, not from traditional civil litigation subject to a challenge to the plaintiffs' ability to state a claim. *See Horne v. Dep't of Agric.*, 569 U.S. 513, 520-22 (2013).

Plaintiffs' third claim for relief is for a "facial and as-applied violation of the Unconstitutional Conditions Doctrine." Defendants' primary argument with respect to this claim is that it "rises and falls with the Takings Clause claim." Docket No. 22-1, at 18:4-5; *see also id.* at 18:25-26, 19:6-11. Indeed, under *Ballinger II*, if there is no taking, there "cannot have been an unconstitutional exaction" (otherwise called an "unconstitutional condition"). *Ballinger II*, 24 F.4th at 1298; *id.* at 1299 ("[W]hatever the government action is, it must condition the grant of a benefit on an unconstitutional taking."); *id.* at 1300 ("[T]he 'starting point to our analysis' of exactions claims is still whether the substance of the condition, such as granting an easement . . ., would be a taking independent of the conditioned benefit. Here, the relocation fee is not a compensable taking, so the relocation fee did not constitute an exaction.") (omitting internal citations). That argument will not work here, however, because – as explained above – the Court has concluded that Plaintiffs' regulatory takings claim is viable at this stage.

However, Defendants also rely on *Ballinger II*'s commentary regarding whether or not the law involved there conditionally granted or regulated the grant of a government *benefit*. See Docket No. 22-1, at 18:27-19:6. *Ballinger II* does in fact support the view that such a claim cannot survive outside the context of granting a government benefit. *See Ballinger II*, 24 F.4th at 1299-1300 ("Here, the Ordinance does not conditionally grant or regulate the grant of a government benefit, such as a permit, and therefore does not fall under the unconstitutional-conditions umbrella.").

Plaintiffs' response on this claim begins by not appearing to address the actual arguments Defendants raise in connection with this claim. *See* Docket No. 25, at 21:10-22:13. They do eventually address Defendants' "government benefit" point, but they do so only by asserting that "the Supreme Court's precedents do not bear . . . out" this "distinguishing mark of the doctrine" that the Ninth Circuit identified. *Id.* at 22:14-18. Whether or not Plaintiffs are correct in that regard is beside the point for this Court's purposes – this Court is bound by Ninth Circuit precedent. Plaintiffs make no attempt to argue that a benefit is involved here. If they cannot avoid the precedential effect of *Ballinger II*, it would seem that this claim must be dismissed. Although the Court will entertain any attempt by Plaintiffs to suggest how they might amend the claim, the Court has its doubts about whether they can possibly do so given the deficiency Defendants have identified.

D. Contracts Clause

Finally, Plaintiffs' first claim for relief is a Contracts Clause claim. The United States Constitution's Contracts Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. However, "[t]he Contract Clause 'does not prevent the [city] from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected.'" *Cal. Grocers Ass'n v. City of Long Beach*, 553 F.Supp.3d 784, 791 (C.D. Cal. 2021) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978)); *see also Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983) ("Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'") (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)).

The Ninth Circuit recently summarized that a law "violates the clause if it (1) 'operate[s] as a substantial impairment of a contractual relationship,' and (2) is not 'drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.'" *CDK Global LLC v. Brnovich*, 16 F.4th 1266, 1279 (9th Cir. 2021) (quoting *Sveen v. Melin*, _ U.S. _, 138 S.Ct. 1815, 1821-22 (2018)). The Ninth Circuit has also instructed that "[t]he threshold inquiry – whether the state law 'has operated as a substantial impairment of a contractual relationship' – itself has three components: 'whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial.'" *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004) (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)).[7] Meanwhile, the Supreme Court informs us that "[i]n answering that [threshold issue], the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S.Ct. at 1822. "In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves*, 459 U.S. at 411; *see also id.* at 413 ("Significant here is the fact that the parties are operating in a heavily regulated industry."); *id.* at 413-14 ("At the time of the

---

[7] The Ninth Circuit clarified that "[t]he first sub-inquiry is not whether any contractual relationship whatsoever exists between the parties, but whether there was a 'contractual agreement regarding the specific . . . terms allegedly at issue.'" *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004) (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 187 (1992)).

execution of these contracts, Kansas did not regulate natural gas prices specifically, but its supervision of the industry was extensive and intrusive."); *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1098 (9th Cir. 2003) ("If the industry has been heavily regulated, then the impairment is less severe because '[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.'") (quoting *Energy Reserves*, 459 U.S. at 411). Finally, "when considering substantial impairment, we focus on the importance of the term which is impaired, not the dollar amount." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 892 (9th Cir. 2003).[8]

"If a substantial impairment is found," a court "then assess[es] the significance of the State's justification and the legitimacy of the public purpose behind the law, such as 'the remedying of a broad and general social or economic problem.'" *Lazar v. Kroncke*, 862 F.3d 1186, 1199 (9th Cir. 2017) (quoting *Energy Reserves*, 459 U.S. at 411-12); *see also Sveen*, 138 S.Ct. at 1822 ("If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation."). A court then "look[s] to whether the change in applicable law is based on reasonable conditions and is appropriate to achieve the stated public purpose." *Lazar*, 862 F.3d at 1199; *see also Sveen*, 138 S.Ct. at 1822 ("In particular, the Court has asked whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'") (quoting *Energy Reserves*, 459 U.S. at 411-12); *Energy Reserves*, 459 U.S. at 412 ("Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'") (quoting *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22 (1977)). "Courts generally defer to the judgment of state legislatures as to both necessity and reasonableness so long as the state itself is not a contracting party." *Lazar*, 862 F.3d at 1199. Here, to not bury the lede (if it is already too late), the Court concludes that Plaintiffs cannot allege (or at least have not alleged) *either* a substantial impairment *or* a failure to appropriately and reasonably serve a broad and general social or economic problem and public purpose.

---

[8] The analytical approach set forth here is applicable in the Rule 12(b)(6) context as well. *See Lazar v. Kroncke*, 862 F.3d 1186, 1199 (9th Cir. 2017) (stating, in context of Rule 12(b)(6) review, that "[i]n conducting a Contracts Clause analysis, we first ask if the change in state law has 'operated as a substantial impairment of a contractual relationship,'" and then recognizing the same "three components" identified in *RUI One*) (quoting *Gen. Motors*, 503 U.S. at 186).

Defendants argue that Plaintiffs' Contracts Clause claim fails because the ordinance "has not substantially impaired the reasonable expectations of landlord-tenant contracting" and because it "appropriately advances a significant and legitimate purpose" because it "is part of a extensive regulation of the landlord-tenant relationship to protect Santa Barbara residents." Docket No. 22-1, at 11:23-12:2. They rely at least partially on the district court's decision in the *Ballinger* litigation, *Ballinger v. City of Oakland*, 398 F.Supp.3d 560, 577 (N.D. Cal. 2019) ("*Ballinger I*"), *aff'd*, 24 F.4th 1287 (9th Cir. 2022).[9] The district court there noted that Oakland's relocation assistance law simply extended relocation payments mandated by California's Ellis Act to no-fault evictions, which Defendants asserts is effectively the same situation in-play in this case. Thus, Defendants argue that a similar conclusion must apply – that the ordinance simply "redistributes the costs so that tenants are not forced to bear the full financial brunt of being evicted." *Ballinger I*, 398 F.Supp.3d at 577. Defendants also note that Plaintiffs "have chosen to engage in a heavily regulated industry: the rental-housing business." Docket No. 22-1, at 13:13-14.

Defendants then also argue that even if the Court were to conclude the ordinance substantially impairs Plaintiffs' contracts with tenants, the means and ends are still supported by a significant and legitimate public purpose. Specifically, they argue that it "serves as a means of mitigating the effects of no-fault evictions and a limitation of the displacement of Santa Barbara residents." Docket No. 22-1, at 14:6-8; *see also* Docket No. 26 ("It should come as no surprise that a city prioritizing affordable housing would seek methods to ensure displaced tenants could afford housing, such as by creating a relocation payment upon a no-fault eviction.").

In beginning an examination of Plaintiffs' response as to this claim, the Court first notes that Plaintiffs contend that the rights they assert are impaired not only arise from their leases with their tenants (in other words, their "contracts"), but also from common law and statutory rights such as the right to recover possession, right of ejectment and unlawful detainer procedures recognized under California law. In support of this point, Plaintiffs assert that the Contracts Clause also protects against impairments of rights and obligations created by legislation, relying upon *Wood v. Lovett*, 313 U.S. 362, 371-72 (1941). This, however, is inconsistent with the notion, recognized in *U.S. Trust*, that the Contract Clause "does not prohibit the States from repealing or

---

[9] From a review of *Ballinger II*, it appears that the plaintiffs in the *Ballinger* litigation did not even appeal the district court's dismissal of their Contracts Clause claim, as there is no mention of it in the Ninth Circuit decision whatsoever.

14

amending statutes generally, or from enacting legislation with retroactive effects." *U.S. Trust*, 431 U.S. at 17; *see also Ballinger I*, 398 F.Supp.3d at 576. *U.S. Trust* therefore indicated that the appellant's claim in that case required, "as a preliminary matter," "a determination that the repeal has the effect of impairing a contractual obligation." *U.S. Trust*, 431 U.S. at 17. If Plaintiffs were correct, any legislative draw-back or other limitation on a right that had been previously recognized would invite a Contracts Clause challenge. Yet, the federal courts are not awash in such litigation. No Supreme Court or reported Ninth Circuit opinion that this Court has been able to locate appears to read *Wood* for the same expansive purpose as do Plaintiffs. In short, the Court rejects Plaintiffs' position as to the scope of rights protected under the Contracts Clause.

Nevertheless, it is not simply this *scope* argument that leads Plaintiffs astray. They argue that the ordinance "has substantially impaired the fundamental right to repossess one's property, including 'who will occupy [the] property and on what terms.'" Docket No. 25, at 12:18-19 (quoting *Hall v. City of Santa Barbara*, 797 F.2d 1493, 1501 (9th Cir. 1986)). They emphasize the size of the payment required, especially as a proportion – 25% – of "the annualized value of the leasehold estate," *id.* at 12:19-22, and the fact that none of the Plaintiffs were ever subject to such a provision before.

Even if the Court were to conclude that the ordinance "impaired" in some respect the "fundamental right" Plaintiffs believe they have identified, it would disagree that the ordinance effects a "substantial" impairment. This is especially so considering the field or industry at issue here – landlord/tenant contracting and relationships. As the district court observed in the *Ballinger* litigation, the plaintiffs in that case were "not able to muster any precedent to support their arguments" regarding substantial impairment, *Ballinger I*, 398 F.Supp.3d at 577, and "the Ordinance does not prohibit owner move-ins, it just redistributes the costs so that tenants are not forced to bear the full financial brunt of being evicted," "merely one more regulation added to the stack of those governing the relationship between Oakland landlords and their tenants," *id.* All of these observations are as true here as in *Ballinger*.

Examining only California Civil Code § 1946.2, *see* Footnote 5, *supra*, Plaintiffs argue that this did not amount to heavy regulation in this field because it required only one month's rent, is temporary (with a sunset provision of January 1, 2030), and took effect only at the beginning of 2020. As to regulation of the industry as a whole, Plaintiffs argue that this broader scope is "misplaced," because "[t]he question is not whether an industry is heavily regulated; it is whether

15

there has been longstanding government regulation 'upon the same topic.'" Docket No. 25, at 14:25-27 (quoting *Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 38 (1940)). Here, in Plaintiffs' view, that "topic" is "the mandated return of rental funds to tenants for repossessed units," something that did not exist in the field prior to 2020, either at the state or local level. *Id.* at 14:28-15:2.[10]

But Plaintiffs' argument ignores, for instance, the Supreme Court's comments in *Energy Reserves* that the question is whether *the industry* has been heavily-regulated in the past. *Energy Reserves*, 459 U.S. at 411, 413-14. Their Opposition brief does acknowledge the existence of *Energy Reserves* once, *see* Docket No. 25, at 11:21-24, but not for this point. It is a seemingly noteworthy omission. The Supreme Court's *Energy Reserves* decision in fact cited *Veix* (albeit via a citation to *Allied Structural*) in support of the rule that "[i]n determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past," *Energy Reserves*, 459 U.S. at 411, thereby seemingly-indicating that an entity that is "already regulated in the particular to which he now objects" is *sufficient* for prior notice to a complaining party, but that it is not *necessary*. *See also id.* at 413 ("The threshold determination is whether the Kansas Act has impaired substantially ERG's contractual rights. Significant here is the fact that the parties are operating in a heavily regulated industry.") (citing *Veix*, 310 U.S. at 38). The Ninth Circuit has repeated *Energy Reserves*' industry-focus at least twice – on one occasion, citing *Veix* in particular. *See Snake River Valley Elec. Ass'n v. PacifiCorp*, 357 F.3d 1042, 1051 n.9 (9th Cir. 2004) ("Our conclusion [on the significant and legitimate public purpose requirement] is reinforced by the fact that for more than thirty years electricity supply has been highly regulated in Idaho . . . .") (citing *Veix*, 310 U.S. at 38); *Campanelli*, 322 F.3d at 1098-99 (discussing "the highly-regulated nature of the insurance industry in California"). Indeed, the Supreme Court again referenced that scope of inquiry later the same year as *Energy Reserves* was issued. *See Exxon Corp. v. Eagerton*, 462 U.S. 176, 194 n.14 (1983) ("Our conclusion is buttressed by the fact that appellants operate in industries that have been

---

[10] Plaintiffs' reference to *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022), as support, is not particularly helpful. That case dealt with executive orders "severely curtail[ing]" "landlords' right to exclude" "for an indefinite duration" and the lack of notice for those types of actions. *Id.* at 729; *see also id.* at 723-25. Putting aside that decision's failure to so much as cite or mention the Supreme Court's *Energy Reserves* decision (and its comments about prior *industry*-regulation, generally), that is quite simply not the nature of the governmental action taken here. As Defendants point out in their Reply, *Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir. 1986) – which, in truth, is not the subject of a great deal of Plaintiffs' focus in their Opposition – is similarly far-afield from the current governmental actions at issue. *See id.* at 1273-74.

16

subject to heavy regulation.").

Finally, Plaintiffs reject Defendants' attempt to rely on *Ballinger I*, because in that situation Oakland had required relocation payments for certain no-fault evictions "[f]or years" before extending the payment mandate to all no-fault evictions. Presumably Plaintiffs are referring to Oakland's decision (also by way of ordinance) – less than two years prior to the issuance of the ordinance actually at issue in that case – to require landlords who evict tenants when withdrawing a unit from the rental market under California's Ellis Act to make a relocation payment to the evicted tenants. *See Ballinger I*, 398 F.Supp.3d at 565. Literally, of course, this less-than-two-year-old precedent, would almost (at least if one were to "round-up") rightfully invoke a "[f]or years" descriptor. Figuratively, however, one might reasonably observe that it is a bit of a stretch to describe it in that way.

In any event, *Ballinger I* did not emphasize the earlier – not much earlier, mind you, but nonetheless earlier – Ellis Act relocation payments precedent other than by pointing out that "when they leased their house [in September 2016], the Ballingers would have been required to make a relocation payment to a tenant they evicted under the Ellis Act." *Ballinger I*, 398 F.Supp.3d at 577; *see also id.* at 566. But this was identified almost as an afterthought, following the earlier observation that "given the 'existence of extensive regulation' of the landlord-tenant relationship, the Ballingers could not reasonably have expected the regulatory landscape to remain unchanged indefinitely." *Ballinger I*, 398 F.Supp.3d at 577 (quoting *Energy Reserves*, 459 U.S. at 416); *see also id.* (noting that the relocation payment was "merely one more regulation added to the stack of those governing the relationship between Oakland landlords and their tenants").

In the end, it is quite clearly Plaintiffs' suggested scope of the inquiry that is "misplaced." It is not for want of trying, because they have virtually no hope of suggesting that the industry in general is lightly-regulated.

Presuming that they have cleared that "threshold" hurdle – for the reasons just-explained, they have not – Plaintiffs next argue that the three months rent requirement does not serve a "broad societal interest." Plaintiffs assert that a law must serve a "broad societal interest" and must not have "an extremely narrow focus" in order to advance a significant and legitimate public purpose, citing *Allied Structural*. *But see Energy Reserves*, 459 U.S. at 411-12 ("If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, *such as* the remedying of a broad and general

17

social or economic problem.") (emphasis added). They then also contend that a law which impairs contracts "is unreasonable when 'an evident and more moderate course would serve [the state's] purposes equally well.'" Docket No. 25, at 11:15-17 (quoting *U.S. Trust*, 431 U.S. at 31).

In support of the "broad societal interest" argument, Plaintiffs analogize the ordinance – presumably because of its application only to "no fault" evictions – to the law struck down in *Allied Structural*. Plaintiffs argue that the pension plan obligations at issue there dealt only with a specific class of employers. They also assert that, here, "the law operates in an area that before 2020 was free of state and even local regulation." Docket No. 25, at 13:27-28. Surely they do not mean the field of landlord-tenant regulations. Again, the landlord-tenant "industry" is *heavily* regulated in California. In any event, the Court agrees with Defendants for why the comparison to *Allied Structural* is inapt – "[u]nlike a pension plan law which applies only to specific employers, the Relocation Assistance Ordinance is designed to promote housing affordability for people of all economic levels, mitigate the effects of no-fault evictions, and limit the displacement of Santa Barbara residents." Docket No. 26, at 10:24-27. While it might relate to a limited category of evictions, *any* tenant could potentially fall prey to such an eviction, "no fault" of his, her, or their own. In contrast, not any employer would suddenly wake up in the morning and find itself subject to the pension plan obligations at issue in *Allied Structural*.

As to any "evident and more moderate course" that would serve the City's purposes equally well, Plaintiffs suggest, as an example, that "the City could have provided subsidies to tenants with an actual need for relocation assistance." Docket No. 25, at 14:4-5. Defendants reject this "more moderate course" requirement because it fails to account for the fact that deference is owed where the state or local body is not itself a party to the contract in question. Indeed, the *U.S. Trust* decision's discussion of that "evident and more moderate course" principle comes in the sentence immediately-following the statement that "a State is not completely free to consider impairing the obligations *of its own contracts* on a par with other policy alternatives." 431 U.S. at 30-31 (emphasis added); *see also Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1107 (9th Cir. 1999) ("An impairment may not be considered necessary if there is 'an evident and more moderate course' of action that would serve Defendants' 'purposes equally well,' because '[t]he contract clause of the Federal Constitution limits the ability of a State, or subdivision of a State, to abridge *its contractual obligations* without first pursuing other alternatives.'") (emphasis added) (omitting internal citation) (quoting *U.S. Trust*, 431 U.S. at 31 and *Cliff v. Blydenberg*, 661

18

N.Y.S.2d 736, 739 (N.Y. Sup. Ct. 1997)); *RUI One*, 371 F.3d at 1171 (Bybee, J., dissenting). Moreover, the *U.S. Trust* decision itself mentioned the principle in the context of a "drastic impairment," something the Court has already determined is lacking here. *U.S. Trust*, 431 U.S. at 31 ("Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well."). In short, there are a host of reasons to question whether the "rule" Plaintiffs believe they have identified serves that role at all[11] or, even if it does, that it has any appropriate application here.

Especially considering both the regulation of the landlord-tenant "industry" in general and the deference that courts owe to such judgments as to both necessity and reasonableness (where the government entities are not themselves contracting-parties), the Court concludes that the ordinance and resolution at issue here were drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose. As a result, Plaintiffs' Contracts Clause claim falls short of both requirements. The claim will be dismissed without leave to amend.

## III. Conclusion

For the reasons set forth above, the Court will: deny the motion as to the second claim (because of the viability of a regulatory takings theory); grant the motion with prejudice/without leave to amend as to the first and fourth claims; grant the motion, likely without leave to amend, as to the third claim; and grant the motion as to the fifth claim, without prejudice to raising an appropriate claim in this Court, or this claim in an appropriate court.

---

[11] *See Sveen*, 138 S.Ct. at 1829 (characterizing the "evident and more moderate course" language as something that Supreme Court cases "suggest") (Gorsuch, J., dissenting)